Case 24-1263 Brent Nash v. Austin Bryce et al. Oral argument 15 minutes per side. Mr. Runyon for the appellant. Morning Mr. Runyon. Morning your honors. Zach Runyon appearing on behalf of appellant Brent Nash. I'd like to reserve 5 minutes for rebuttal. So this is really a fairly simple case. Brent Nash was a prisoner in a Michigan Department of Corrections facility. In the day in question he had gotten into an altercation with another prisoner which resulted in Mr. Nash being transported to a different unit. During the transport Mr. Nash was handcuffed behind his back. I think importantly defendants admit that before the transport started Mr. Nash was not resisting at all. So nothing that happened before the transport is relevant. During the transport Mr. Nash says he was not resisting at all. The defendants had him. Mr. Bryce was on his left side. Mr. Turner was on his right side. They each had two hands on Mr. Nash's arms. Mr. Nash says he wasn't resisting at all. They walked through two sets of doors and as they entered the prison yard the defendants slammed Mr. Nash on his face. Now I think the error in this case really results from the court viewing the video as maybe a neutral fact finder. I think if you read the magistrate's opinion it almost seems like they're viewing it in the light most favorable to defendant. I see this happen a lot. The most interesting issue to me is the ALJ determination and what we do with that. So do you want to discuss that because we have this case Roberson that seems very similar to this case and in that case they said there was preclusive effect for the findings by the ALJ. Well the Sixth Circuit has also said that you have to look at the accuracy of the findings and the fairness to the plaintiff in the case and I think when you compare the ALJ's findings to the facts that have come out in discovery the ALJ's findings were not accurate. I had the case backwards. So Peterson is the case that's pretty close and then is Roberson the case that comes after? That's correct. Roberson's the case that remanded it to the district court and told the district court. What's different about this case from Peterson? Well I think what's different is that the ALJ's findings are contradicted by the record in this case. I think what's really important is that the ALJ... Is there structurally anything different? Is there structurally anything about how the ALJ in that case went about sort of looking at the evidence the way the ALJ here sort of went about looking at the evidence? Well I think there's two big differences. One is that the plaintiff in this case did not get any of the evidence that the ALJ used. And second... And Peterson get the... Peterson get the... Did that plaintiff get the evidence? Well I... Judge I believe he did. I might be... Well I mean I think the cases are really similar and they... His whole point is they didn't have the videos and they make the point that well you should have raised that... You didn't get the videos but you should have raised that on appeal. Didn't. Same here. But I think that the really big distinction is that in this case the plaintiff asked for all the evidence that the ALJ was going to use. He wrote a letter where he asked for all of the witness statements. He asked for all the evidence that was going to be used. And he never received any of that. The letter is undated and the ALJ's report says that the prisoner did not request witnesses, submit questions or request evidence. I think that creates an issue of fact. I think that's something that would have to be decided by a jury because that obviously is conflicting because we have a letter from Mr. Nash requesting those exact things that the ALJ... So there are these in the... There are these memos that I can just show you what I'm holding. You've probably seen it before but these memos that sort of describe what's on the videotapes. Were those provided to your client during the ALJ hearing? Based on the ALJ report nothing was provided to my client. He didn't receive any of that. I don't think the ALJ says that. Videotapes they say your client didn't get to see. But they also say there's a whole... They say the record was reviewed with the prisoner consisted of the following and it lists a whole bunch of things. Well my understanding of the report is that that happened at the hearing not prior to. And so what the report says is that... The ALJ says that because my client was uncooperative with the investigator he was not provided with any of the evidence. And so I think that's where the main issue comes in. How's that different? In Peterson the defendant didn't get the evidence and didn't... Or the plaintiff ultimately the inmate didn't get the evidence and didn't appeal it. Kind of the same thing here. I don't disagree necessarily but I think Roberson the case that comes after walks back Peterson a little bit. I think it looks at Peterson and it says you can't just accept what the ALJ says without weighing the accuracy of what the ALJ found and the fairness of the proceedings. I don't think you can say it was fair when my client didn't get to see the evidence and there was no statements taken by the defendants in this case. Well you didn't ask for them. Well I... There were statements. There were statements given by... There was... There's two statements in here. Not from Turner. There's a written statement by Bryce that essentially just says that Mr. Nash was resisting... Actively resisting and lunged away from me at the housing unit front entrance. I placed prisoner on the ground. And what's interesting about that is in this case when deposed Officer Bryce admits that my client never lunged away from him. He says well actually what happened is Mr. Nash turned towards me. Well in this case. I mean I don't know. I really haven't heard anything that distinguishes Peterson except I think your point is that we just shouldn't believe the ALJ. You think the ALJ's work here was shoddy. Well I... We shouldn't believe the ALJ. Well I think Roberson says that's what you have to do. It says that you have to look at the... Well Peterson is exactly... Peterson is very, very similar. Very, very, very similar to your case. So Peterson can... I mean Roberson can say some other things whether that's consistent with the prior case or not. I don't... You know you could debate that. But it just feels very, very consistent to me to the first case. Well I agree that Peterson is very similar. But I think what Roberson did is it looked at Peterson and it said I think we went too far. Well we can't do that. I don't think you can do that. But I think it's... But in Roberson it specifically remanded it to the district court to look at the accuracy and the fairness of the findings. In different facts. With different facts. But it was the same ALJ type conference. Right. But there was different facts. Well there wasn't a holding but there were different facts. I don't know. I mean one panel can't overrule another, right? So if we have a binding case and another case that says well you can... There are sometimes you can look at other things. Neither that panel nor us can undo the first case. I don't think it was an overruling necessarily. I think it was just an expansion of what the court should consider. And in this case the district court never considered the accuracy of the ALJ's findings. It never considered the fact that even though Mr. Nash requested to have all the evidence that it was never provided to him. And I think that... That's also true on Peterson. But Roberson specifically says that. I understand your point. Can I ask about some of the mechanics of the ALJ proceeding here? I understand that there was a complaint against your client because of assault against another inmate. And then there was also the complaint against the assault against staff members. And that second complaint about staff members. Did that even include like what happened in the cafeteria after the Trey incident and all of that stuff? Because there's definitely some... Well the video seems much clearer about an assault and harm and resisting in that moment right after. Is that clumped together with the assault allegation later on when they're going out into the yard? Are those together? That's my understanding. They were clumped together. What happened with Mr. Nash and the prison officers in the cafeteria. It wasn't quite the cafeteria. Yeah, sorry. And then it continued to what happened in the prison yard. That's correct. So even if he was in the ALJ proceeding, like even if he was correct or able to prove that, hey in this moment with the takedown in the prison yard, I wasn't resisting. Like when they were walking through that breezeway. Like he would still be, you know, arguably the ALJ could still say, well yeah you're still guilty of a staff member because look at the video of the cafeteria. I think that's correct. And I think what's also important to remember is that the ALJ's findings are only preclusive to factual issues. And I think even if you give the ALJ's findings, you know, the most preclusion it can have, it still just says that Nash turned around when he got into the prison yard and that he, quote, actively resisted. I'm not quite sure, you know, exactly what that means. But I think that doesn't defeat the Eighth Amendment claim, even if you do give that preclusive effect. But I do think you're right, Judge. I think that was grouped together, which complicates the issue even further. One of the things we look at, and I think both Peterson and Roberson, but more important, Elliott, which is the Supreme Court case we're bound by, tells us to look at the kind of the incentives, right? I mean this kind of basic collateral stop all preclusion questions even outside of this context, right? We say, like, did someone have the same incentive? If Mr. Nash knows he's, you know, going to lose, or if he's likely to lose because he clearly resisted and assaulted officers in the cafeteria, it seems like, you know, the incentives start to look very different when you've clumped both of these things together. I agree. And I think, you know, the same hearing also analyzed whether or not he assaulted a prisoner earlier that day. Right. That obviously did happen, and so I think that diminishes his incentive even further. Isn't assaulting a guard worse than assaulting a prisoner? He shouldn't assault anybody, but isn't it worse to assault a guard? I think it depends what you mean by that. Are the penalties different in the prison? Are there additional penalties? I'm not sure. I don't think there's been any facts to establish that in this case. So you don't think there would be any potential basis for more significant ramifications for your client if he's assaulted two people rather than just one, or three people rather than just one? Well, Judge, it depends what you're asking me. Could I logically see how that would happen? I do logically see how that could happen. Do I know that's how the MDOC operates? I don't know. Well, we're sort of speculating about his intent to oppose it because one offense was more likely than the other, so I feel like we could probably speculate the other way just as well. I'm not sure why this is so conclusive. Well, I don't know that what Judge Blumkatz is doing was speculation. I mean, I think that's the truth of it is that he already had two assault charges that were going to be hard to beat. Including one against a guard. Including one against a guard. I don't know if it's accurate to say that if he continued to actively resist as they were escorting him, if that would have increased his penalty at all. I think without evidence in the record at the summary judgment stage, I don't think you can make that finding. Thank you. Thank you.  It's rebuttal time, too. Alex, good morning. Good morning, Your Honor. May it please the Court, I'm Chris Alex. I represent the appellees, and I'm asking this Court, affirm the district court's grant of summary judgment primarily because the administrative law judge first, and thereafter the magistrate judge, and thereafter the district court judge, all reached the same correct conclusion about the most outcome determinative fact. That being the plaintiff was physically resistant in the moments preceding the takedown to respond to the court's inquiries about the administrative law judge and whether it's speculation about whether there was an incentive or an intention of the prisoner to contest that second ticket. You do not need to speculate that he was aware of the significance and that he did, in fact, contest that specific component because in the administrative law judge's report, there is a direct quote from the prisoner. Can you talk to us about how you read? Can you just finish this point? I'd just like to hear the answer to this point before you move on. Wherein the prisoner, in quotations, argues that he could not have resisted the guards as he was being transported because he claimed he had already broke his ankle. Now his claim since is that he broke his ankle from the takedown, but you can be sure that he was aware and had an incentive to contest that ticket because he is giving essentially an alibi that is recorded by the administrative law judge as part of a very detailed report that took pains to actually differentiate in detail the ticket involving the prisoner he clubbed over the head in contrast to the ticket involving the resistance to the staff, including that assault on a staff member extends to physical resistance of the staff member, not merely an act, for example, of punching or kicking or more actively assaulting the officer. Thank you. Can you discuss Judge Riedler's questions about the relationship between Peterson and Berberson? I think those are quite interesting. In broad strokes, yes. There is no real material distinction because, as the court identified, it is a structural focus in terms of the fairness of the hearing, and the record evidence in this particular case establishes that the administrative law judge went over the exhibits with the inmate. But take this case just to the side for one second and talk to me about Peterson and Berberson. Like, are these cases in tension? Does one purport your friend just said, well, one kind of walks back the other? Are they in harmony? How do you read these cases together, and how do you suggest we read them? They are in harmony, in my view. In terms of their main point, they are concerned with the structure of providing the inmate with a fair hearing in front of a dispassionate administrative law judge that has the ability to take evidence in the event that the prisoner chooses to give evidence, and in this case he did, for example, with the alibi I just mentioned. And the main evidence here in this case, now going back to this case, the main evidence you would think is probably the videos, right? Yes. Okay. And I know there's confusion in the record, but if Mr. Bash requested all the evidence and didn't get to see the videos, we know he didn't get them, he didn't get a time play-by-play or things like that like in other cases. If he didn't get the main piece of evidence, we're saying this is a fair adjudication? Yes, and may I explain why?  Sure. In other cases, inmates are not permitted to see the video because of legitimate safety and security concerns that are unique to a prison facility. I would happily concede that in a certain type of case where, for example, identity is the issue, right, an inmate may be required to be provided a still frame or footage of, for example, them in the yard so they have an opportunity to say, that's not me. You've got the wrong inmate. My defense is identity. I would concede in that type of scenario there would be a more close question about whether or not Peterson applied, for example, or Roberson applied, for example. We don't have that situation here. There is no contesting identity, and therefore, it must be acknowledged the inmate was there. The question is not if he was there or not, but he wants to point to the video per se, just hypothetically, and say, look, I was not resisting. Kind of like somebody might say, look, I was not there. But he doesn't have that opportunity because he doesn't see the video, nor is there, he's not given a time ticker either, or like a, you know, the time stamp this, this is happening, time stamp this, shuffling feet, time stamp, he's not given anything. I agree. However, his story or his alibi is not, I was resisting here, later on I resisted a little bit for this reason. In other words, he is not parsing or segmenting his physical resistance to explain why he did what he did in a certain moment and why that changes the complexion of the administrative law judge's determination. This plaintiff, by contrast, his story is I wasn't resisting at all. Even in the cafeteria part? Oh, I'm sorry. In the context of his transport or the facts underlying the assault on staff charge. Okay. His alibi is how could I resist them, and again, going back to the quotation, when my ankle was broken. Well, he had, of course, his hands were handcuffed behind his back, so you'd think he couldn't resist too much. I thought his claim is that I wasn't resisting when they took me out into the prison yard and I didn't turn toward Officer Bryce. In the takedown, I was turned around toward him. So this court, traditionally, is willing to parse claims into different segments of activity. However, those segments are generally divided into some appreciable or material change in setting or circumstance. One example I could give you, albeit a Fourth Amendment case, but the objective component is the same, is from a published decision from June of 2022, Bell v. City of Southfield, 37F4362. It involved a traffic stop where the defendants were the patrol officers and the plaintiff was the driver. Where the court parsed the segments of the claim involved activity while the plaintiff was still inside the vehicle and there was an allegation of who grabbed who through the window. And in the second segment, they parsed it, events that occurred once he was curbside and eventually there was a scuffle that led to him being tasered. Now, going back to the court's point, in Bell, the court ultimately said the video blatantly contradicted the plaintiff's account curbside because the plaintiff presented his claim that he did nothing wrong and was tasered for no reason. When, in fact, the video showed not only the scuffle, but repeated acts of the plaintiff moving his hand in physical resistance of being detained. So, in this particular case, applying that, the court can certainly parse if it finds some particular circumstance or material change in the setting. However, we have physical acts of resistance while the inmate was cuffed throughout the course of the transport, from the base through the breezeway or the hallway, transitioning to outside. Would you think it makes sense to parse what happened in the cafeteria from what happens in the breezeway in the transport? So, take the video that shows us the breezeway walk and then into the prison yard. In this particular case, I would say no because the limited amount of time or seconds that were involved in the short distance. So, if he's resisting in the cafeteria, they can take him down in the prison yard? No. Okay, so then we should look to see what's happening in the breezeway. The court should look to the totality of circumstances. But when deciding where's that line, where's that lull, where's that change in circumstances to parse, you have to take into consideration events that occurred in the moments preceding the takedown. Just because they transition from one door to the next does not automatically translate into a change in circumstance. Would a change in circumstance be cuffing someone? It would be a factor that the court would consider. So, in a certain type of case, absolutely. However, in this case, it's important to put into context that the physical resistance continued after the inmate was cuffed. My counterpart here indicated that after they subdued him in the base, I think that's how it's referred to in the record, but it's basically the module where he clubbed the other inmate over the head, he was not resistant. That is simply not true. He continued to be resistant. And the record evidence of the defendants was that he was resistant once he was stood up to begin the transport. So I don't think that in this particular circumstances, the cuffing can be the break because of the context of what we have thereafter. What do you think that the Breezeway video shows us? I believe, in and of itself, the Breezeway video shows us that the inmate is physically resistant to transport by moving his shoulders from side to side, shuffling from side to side. And you can be sure of that, in part, because in this particular unique case, we have the benefit of another inmate who was being taken on the same transport, in the same Breezeway, for the same offense, fighting at the base. And when you contrast our plaintiff with the movements of that other plaintiff, you see a completely different physical demeanor. He's not going side to side. Yes. What do we take from the fact that Turner testifies that the side to side wasn't really that much? He didn't really consider resisting or that much? Sure. The same Turner also testified that there were other acts of physical resistance that did occasion him to use force, most notably the pulling away and the fact that he was losing control of the inmate as they transitioned to outside. That's consistent with Bryce as well. Do you think we can see that on the video? Which part? The testimony about this other resistance. I agree, you know, Turner goes into a lot of detail, right? But we're at a point where, you know, we're on summary judgment, so we can serve in favor of the plaintiff unless it's blatantly contradicted by the record. So I'm trying to say, what can we see in this video? We can see some side to side, but I'm trying to figure out what I'm supposed to see when I see this video. Sure. So from one of the corrections officers as they transition outside, you can see the CO's arm extended consistent with his testimony that he's losing control. Okay. But I would add, understandably so, in any video case, right, Scott versus Harris isn't limited to video evidence. Of course. But that's what we're talking about here. There is a natural tendency to go straight towards characteristics innate to the quality of the video itself. What's the distance? What's the angle? Is it color or black and white? Is there sound or is it silent? Now, certainly those are all factors that the court takes into consideration. But to answer this court's concern, the first step in terms of what am I looking for, all revolves around the context of what is the core assertion of the plaintiff in the first place? By core assertion, I just mean thing that he can't afford to be wrong about and still prevail. The same video is going to be enough in some cases and not enough in others. And the difference will revolve around that core assertion. But the video will be enough to blatantly contradict his core assertion, or it won't be enough to blatantly contradict it. That's what we're looking for, right? Yes. Okay. So how does the video, so we have an outstretched arm, how does the video blatantly contradict his assertion? He's saying, you know, we see him kind of bend over. There's a question about was I bent over or did I bend over, right? There's the turning, right? We don't know why he's turning. Is he doing it volitionally? Is he being turned? We have Officer Turner deposed saying, oh, no, we turned him when we were taking him down. So I'm trying to figure out what of that core assertion that you're just telling me about is blatantly contradicted by the video. You're asking me to, like, do a lot with an outstretched arm. I would ask this court to take the same approach in Bell, which is the core assertion is I was not physically resistant. And that's the end of the core assertion. It doesn't devolve into, well, yes, maybe you were physically resistant a little, but what were you doing in the two seconds before the takedown or the half a second before the takedown? And then the second thing I would point out is that with Eighth Amendment claims, unlike Fourth Amendment claims, we're dealing with both an objective and subjective component. So it is certainly reasonable for the corrections officers in moment, without the luxury of hindsight, to interpret his movements in those seconds as continued resistance when it is on the heels of a pattern of ongoing resistance in the seconds proceeding. And I see my time is up. I have one other question. Did you have any follow-up for that? You started off by talking about the reasons why the plaintiff may have had reason to oppose the proceeding in front of the ALJ and oppose all aspects of it. And you talked about the ankle issue. I was just thinking from a punishment perspective, is there anything in the record that would discuss whether the punishment would be greater depending upon the number of offenses or violations the inmates found to have engaged in? Like in criminal law, obviously, more offenses is usually worse than less for the defendant. But is there anything in the record here that would tell us, show, demonstrate why it might be in your interest? Intuitively, it would be in my interest, I would think, to defend against all charges. But is there anything here that would show kind of a scale of discipline or is it just kind of all up to the ALJ? What we have in the record evidence, independent of, yes, of course, assaulting a staff member is generally going to be more serious than assaulting another prisoner. I can see that what we have in the record evidence is just that they are both class one offenses. And so that's what the record says at this point. Is there, if you have multiple class one offenses, is there anything in the record that would demonstrate that that's worse for an inmate or? Not in the record. Ron, anything you want to add? Okay, thank you very much. Thank you all. Mr. Romney, I think you have five minutes. Thank you. So I just want to clear up one factual issue. I heard Brother Counsel state that my client continued to resist once he was in handcuffs and placed on his feet. That's actually rejected by Defendant Bryce in this case. He said that once my client was on his feet, he wasn't resisting, he was just standing there. And that comes from ECF 36-6-2, page ID 277. And as for Roberson and its effect on Peterson, I think the best way to explain it is that it was helping explain the rule that Peterson tried to set out. And Roberson explains that Peterson is not a blanket blessing on every factual finding in a major misconduct hearing. And I think it's important to note that Roberson was also analyzing an ALJ hearing just like in this case. It was a misconduct hearing in a Michigan prison. And so I do think it's very important to follow Roberson, and in this case look at what is the accuracy of the ALJ's findings. And again, I don't think it's a small point that one of the ALJ's factual findings is that Nash turned towards officers. And that's actually blatantly contradicted in this case where Turner admits Nash didn't turn around on his own. Nash was turned around by Bryce because Bryce wanted to slam him to the ground. How do we do, you know, there's, I mean, preclusion applies to lots of cases where someone could have done a better job litigating their case. But the fact is that they had a chance to litigate the case. And so your point to me sort of says in this case your client's made a better case than he made the first time around. But that's not necessarily dispositive. I mean, usually we look to see what happened the first time and whether you had a full chance to litigate the matter. And if you did, and you did a poor job for one reason or another, you know, that there's consequences to that. I think there is a large difference, though, between applying issue preclusion to, you know, cases in a court system, to other cases in the court system, as opposed to a hearing that's conducted in a prison where the prisoner has no representation, the prisoner does not have access to all of the evidence, cannot conduct witness statements on his own. You know, as just to take a blanket matter, those points resonate. Peterson kind of took all this on and said it does count. But then Roberson looked at it again and says it can count, but you have to look at it. So do you concede you lose? If Peterson was the only case between the two that existed, do you concede that you lose? On just Peterson? I think that is – well, lose what issue? The preclusion issue. Yeah, that we have to defer to the LJ findings. Agree, but just on the very limited factual issues. But I think Roberson – I mean, again, I don't – I sort of disagree, I guess, because what Roberson does is it explains Peterson. So if you apply Peterson in the way that Roberson tells you not to, and that's to provide a blanket finding that the ALJ's findings are always preclusive, then yes. But what Roberson says is that's not what Peterson was saying. So if you apply Peterson in the way that Roberson describes it, I think Nash would win. Because, again, this was not – you look at the accuracy, the accuracy is not there. And I don't think it's a small issue that Turner was never asked to provide a statement because Turner pretty much blows this whole thing up. I mean, he says everything that the ALJ found was not true, and Bryce was visibly upset. He had no reason to do what he did. This should have never happened. And I don't think we can ignore that when the ALJ never even asked Turner or gave Nash the opportunity to ask Turner what happened. So that, I think, is contradicted by the ALJ's report, which says the investigator met with the prisoner, and the prisoner did not request witnesses, submit questions, or request evidence. But then you look at Nash's letter where he says, I want all of these things, and there's no explanation for why he didn't get it. Can you remind me one thing about Peterson? Was there an issue about the incentive in that case? Like here, Nash is going to lose on the guard assault claim based on what happened in the base, regardless of what happens in the yard. Does that issue come up in Peterson? Not that I remember, Judge. I don't see that issue.  Okay. And I do think that is an important distinction as well. Does it come up in Roberson? Well, Roberson I don't think discusses it, but it says, you know, I don't want to keep repeating myself, but Roberson sends it back down and tells the court you need to analyze more factors than just saying, well, here's an ALJ finding. It's the same type of hearing in Peterson. You cannot just say, without analyzing it further, that Peterson is going to always result in ALJ's findings being preclusive. And Roberson specifically tells us to look at the incentives, just like a traditional preclusion analysis. Exactly.  So I see my time is up, unless there's any more questions. Okay. No, thank you very much. It was a very well-argued case, and we will submit it.